John T. HALBERT

v.

The PRUDENTIAL INSURANCE COMPANY OF AMERICA.

No. B–75–249–CA.

United States District Court, E. D. Texas, Beaumont Division.

May 16, 1977.

Dale Dowell, Rienstra, Rienstra & Dowell, Beaumont, Tex., for plaintiff.

Robert Q. Keith, Mehaffy, Weber, Keith & Gonsoulin, Beaumont, Tex., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

STEGER, District Judge.

### FACTUAL SUMMARY

This is a suit brought by the plaintiff, John T. Halbert, for medical expenses ex-

---

pended on behalf of his son. The Plaintiff's son was placed in a psychiatric institution known as the Oaks Center of the Brown Schools located in Austin, Texas. During the time the Plaintiff's son was in the Oaks Center, there was in full force and effect a medical insurance policy which covered the Plaintiff's son. The policy provided that it would pay charges in connection with any mental illness or functional nervous disorder to the extent that they are incurred during an in-patient hospital confinement. The policy further has a definition of the word *hospital*. The issue facing the Court is whether the Oaks Center qualifies as a hospital under the definition in the policy. If it does, the Defendant is liable for the medical expenses incurred by the Plaintiff for his son's stay at the Oaks up to a maximum of $10,000.00.

## FINDINGS OF FACT

### 1.

The Court finds that prior to August 1, 1972, the Plaintiff entered into a contract of insurance with Defendant, said contract being Texas Medical Association Group Policy # GZ82750, Certificate No. TO 3–436–01, which policy became effective as to the Plaintiff on August 1, 1972.

### 2.

Under this policy of insurance, the Plaintiff obtained coverage for certain hospitalization and major medical expenses by virtue of his membership as a practicing physician in the Texas Medical Association. In addition to the coverage of Plaintiff, said policy of insurance provided for certain coverages with respect to Plaintiff's son, John Barton Halbert, as a "dependent" of Plaintiff.

### 3.

The Court finds that effective November 1, 1974, said policy was amended in certain respects. Also, on or before November 1, 1974, a certain rider became attached to the certificate of insurance held by Plaintiff under this policy.

### 4.

Insofar as is pertinent to the issues in this suit, the Court notes certain provisions and definitions contained in said policy of insurance, the amendment to said policy, and the rider thereunder.

(a) Section D of the major medical coverage of said policy, as applicable to the Plaintiff and the Plaintiff's son, has provided as follows at all times material hereto:

"*Charge Limitations For Certain Illnesses*:

(1) Mental Illnesses or Functional Nervous Disorders. Charges in connection with any such illnesses or disorders of a covered individual will be included only to the extent that they are incurred during an in-patient Hospital confinement."

(b) At all times material hereto the said policy of insurance has contained the following definition:

"*Hospital*: Only—(1) an institution which is operated pursuant to law and is primarily engaged in providing on an in-patient basis for the medical care and treatment of sick and injured persons through medical, diagnostic and major surgical facilities, all of which facilities must be provided on its premises, under the supervision of a staff of physicians and with 24 hours a day nursing service, or (2) an institution not meeting all of the requirements of (1) but which is accredited as a hospital by the Joint Commission on Accreditation of Hospitals."

(c) The Court further finds from examining said policy of insurance, the amendment thereto, and the rider thereto, that at all times material hereto the Plaintiff's rights under the insurance contract have been limited by the following provision:

"Not more than $10,000 is payable for charges incurred in connection with all mental illnesses or functional nervous disorders during a person's entire lifetime." Similarly, the insurance contract at all times material hereto, in Section C of the major medical coverage, has provided that the aggregate benefits payable under said coverage for a person's illnesses during his entire lifetime shall in no event exceed the applicable individual maximum.

(d) The Court finds that the above stated individual maximum of $10,000.00 was carried forward by the rider referred to above, in that such rider also contains the individual maximum benefit which provides that not more than $10,000.00 is payable for charges incurred in connection with all mental illnesses of functional nervous disorders during a person's entire lifetime.

(e) With respect to the amendment to the policy, effective November 1, 1974, the Court does not find that the amendment increased the individual maximum from $10,000.00 to $20,000.00 (or for that matter to any other figure) in the context of this case. Instead, the Court finds that this amendment was governed by Sections D and E thereof, which provide that as to a qualified dependent, any adjustment in benefits in favor of said dependent are deferred until said dependent's final medical release from confinement for medical care or treatment in an institution or at home. Accordingly, inasmuch as the Court finds hereafter that John Barton Halbert was so confined on and after November 1, 1974, no increase in benefits occurred in said dependent's favor until his final medical release from confinement on or about May 30, 1975.

(f) The Court further finds that this insurance contract at all times material hereto has expressly excluded coverage of charges for physicians' services or x-ray examinations involving any of the teeth.

(g) Having examined the major medical coverages provided by the insurance contract in question, the Court finds that benefits payable under said coverages are calculated on the basis of eighty percent of the first $5,000 of eligible charges, and one hundred percent of eligible charges in excess of $5,000, during a benefit year, but subject at all times to the individual maximum of $10,000.

5.

On March 7, 1973, John Barton Halbert, the Plaintiff's son and dependent under the insurance contract made the basis of this suit, entered The Oaks Residential Treatment Center of the Brown Schools, Austin, Texas, and remained confined there until his final medical release on May 30, 1975.

6.

John Barton Halbert was referred to The Oaks by Dr. William Boylston of Houston, Texas, the boy's child psychiatrist.

7.

The Court credits Dr. Boylston's testimony that such referral of John Barton Halbert was based on Dr. Boylston's diagnosis of the boy as suffering from a mental illness or functional nervous disorder. The Court also credits the testimony to the same effect—mental illness or functional nervous disorder—of Dr. Jackson R. Day of The Oaks. Until July 1, 1974, Dr. Day was John Barton Halbert's supervising psychiatrist at The Oaks. On that date, Dr. Day became director of the Brown Schools, of which The Oaks is a subsidiary unit. Thereupon, Dr. James Boynton of The Oaks became the boy's supervising psychiatrist until the boy's release on May 30, 1975.

8.

The Court is unable to find from the evidence that at any time material to this suit, i. e., anytime between March 7, 1973, and May 30, 1975, was the Oaks a "Hospital" within the meaning of the contract of insurance sued upon.

(a) First, the Court credits the testimony of Dr. Day that at no time during the period in question was The Oaks primarily engaged in providing, on its premises, any of the following: major surgical facilities, diagnostic facilities such as pathology laboratory, x-ray facilities or x-ray equipment other than the dental, or facilities and equipment for surgical anesthesia. With particular respect to the absence of laboratory facilities, the Court credits the testimony of Dr. Day that the services of a laboratory are frequently useful in the treatment of psychiatrically ill adolescents and children. However, the Court notes the testimony of Dr. Day that, at all times material hereto, it was the practice of The Oaks to contract with firms outside the premises of The Oaks for laboratory services.

(b) The Court is unable to find from the evidence that at any time material to this

suit, i. e., anytime between March 7, 1973 and May 30, 1975, was The Oaks accredited as a hospital by the Joint Commission on Accreditation of Hospitals (JCAH). In this respect, the Court credits the testimony of Dr. Day that the only JCAH accreditation possessed at any time by The Oaks was accreditation as a Children's and Adolescents' Psychiatric Facility. The Court also credits the testimony of Dr. Day, supported by the testimony of Dr. John D. Porterfield, Director of the Joint Commission on Accreditation of Hospitals, that, effective December 19, 1974, The Oaks received JCAH accreditation as a Children's and Adolescents' Psychiatric Facility. The Court further notes that Dr. Porterfield, when asked to name and give the location, by city, of every children's and adolescents' psychiatric treatment institution in the state of Texas which, at any time since January 1, 1973 to the present, has held JCAH accreditation as a Hospital, Dr. Porterfield named The Children's Medical Center in Dallas, Texas, but *did not* name The Oaks Residential Treatment Center.

(c) The Court credits the testimony of Dr. Day that at no time prior to December 19, 1974, did The Oaks possess any sort of accreditation whatever from the Joint Commission on Accreditation of Hospitals. Further, the Court credits the testimony of Dr. Day that The Oaks never sought JCAH accreditation of any type prior to its application for survey as a Children's and Adolescents' Psychiatric Facility, during the summer of 1974.

9.

Having heard the evidence and having examined all of the depositions and the exhibits thereto, the Court is unable to find from the evidence that accreditation of The Oaks by the JCAH as a Children's and Adolescents' Psychiatric Facility constituted accreditation of The Oaks as a Hospital. More particularly, the Court has examined the exhibits provided by Dr. Porterfield in response to subpoena duces tecum and from said exhibits the Court finds the following:

(a) In the Accreditation Manual for Hospitals of its Hospital Accreditation Program, the Joint Commission on Accreditation of Hospitals mandatorily requires the following in order for a health care institution to be eligible for an accreditation survey as a Hospital:

(1) Dietetic services
(2) Emergency services
(3) Environmental services
(4) Medical records services
(5) Nuclear medicine services
(6) Pathology services (meaning a diagnostic laboratory)
(7) Pharmaceutical services
(8) Physical medical services
(9) Professional library services
(10) Radiology services (x-ray)
(11) Respiratory care services
(12) Social services
(13) Special care services; and the institution must have at least one of the following clinical services: "Medicine, obstetrics-gynecology (with anesthesia), pediatrics, or surgery."

(b) By contrast, the Court finds from the JCAH's Accreditation Manual for Psychiatric Facilities Serving Children and Adolescents that the JCAH imposes different standards for accreditation as a Children's and Adolescents' Psychiatric Facility. To be eligible for a survey as a Children's and Adolescent's Psychiatric Facility, the facility must be a psychiatric facility defined as an organization with a governing body, its own administration, and a mental health professional staff, and having as a primary function the assessment and/or treatment and rehabilitation of children and adolescents with emotional and/or behavioral disorders and/or deviations or disturbances in their development, and at which there are psychiatrists or other physicians who assume medical responsibility for all children and adolescents under the case of the facilities. The Court finds that there are some additional requirements for survey as a Children's and Adolescents' Psychiatric Facility, but they are not as detailed or complete as the requirements that are imposed by the JCAH for survey under the Hospital Accreditation Program. Further, they are narrowly focused to the field of psychiatry,

unlike the requirements for accreditation as a Hospital.

**10.**

The Court further finds from the testimony of Dr. Porterfield that the accreditation programs for, respectively, Hospitals and Children's and Adolescents' Psychiatric Facilities are separate programs and categories of accreditation, which began at different times (Hospitals in 1951; Children's and Adolescents' Psychiatric Facilities in 1974), and are administered by different accreditation councils of the JCAH.

**11.**

The Court further notes from the examples of forms supplied by Dr. Porterfield for application for accreditation survey, the information required by the JCAH is correspondingly different in the case of a Hospital as opposed to a Children's and Adolescents' Psychiatric Facility. However, one of the official exhibits to Dr. Porterfield's deposition shows that the University of Texas at Galveston Medical Branch, which, according to Dr. Boylston contains a children's and adolescents' psychiatric treatment unit, is accredited as a Hospital by JCAH. Thus, the Court finds that a health care institution which is accredited by the JCAH as a Hospital can include within it a children's and adolescents' psychiatric unit. Another such example, cited by Dr. Porterfield, is the Children's Medical Center in Dallas, Texas.

**12.**

The Court credits the testimony of Dr. Boylston that treatment of the type provided to John Barton Halbert by The Oaks can be obtained at The University of Texas Medical Branch at Galveston, Division of Child and Adolescent Psychiatry. The Court notes that Dr. Boylston, who himself is a diplomate. in Child Psychiatry, has taught at The University of Texas Medical Branch at Galveston, and has published a paper in the American Journal of Psychiatry on the teaching of psychiatry to psychiatric residents, and another article on phobic mental illnesses in children, published in International Aspects of Psychotherapy.

**13.**

The Court does not find that the insurance contract made the basis of this suit, or the definition of Hospital contained therein, was impossible of performance during the period of John Barton Halbert's stay at The Oaks Residential Treatment Center in Austin, Texas.

**14.**

The Court finds from the testimony of Mr. Dunson King, the custodian of patients' accounts records of The Brown Schools, Austin, Texas, that, on and subsequent to December 19, 1974 (the date upon which accreditation by the JCAH as a Children's and Adolescents' Psychiatric Facility became effective as to The Oaks) the total of charges made by The Oaks for the care and treatment of John Barton Halbert was $8,166.02.

**15.**

It is the ultimate finding of the Court that at no time during the period from March 7, 1973 through May 30, 1975 was The Oaks Residential Treatment Center of The Brown Schools, Austin, Texas, a "Hospital" within the meaning of the contract of insurance made the basis of this suit.

### CONCLUSIONS OF LAW

**1.**

The Court has subject matter jurisdiction over this controversy, and personal jurisdiction over the parties.

**2.**

The applicable rules in construing the insurance contract at issue herein are the following:

"The language used in the policies 'must be construed according to the evident intent of the parties, *to be derived from the words used*, the subject matter to which they relate, and the matters naturally or usually incident thereto,' and it is only when 'the words admit of two constructions, that one will be adopted most favorable to the insured.'" *State Farm Mutual Automobile Ins. Co. v. Pan American Ins. Co.*, 437 S.W.2d 542–544 (Tex.

**548**

1969); *Aetna Life Ins. Co. v. Adams*, 447 S.W.2d 453, 454 (Tex.Civ.App.—Beaumont, 1969, writ ref'd n. r. e.).

Likewise,

"A policy which provides coverage only if it 'has' stated facilities does not mean that there is coverage if it 'has access' to such facilities in another institution at a different place." *Guardian Life Ins. Co. of America v. Scott*, 405 S.W.2d 64, 65 (Tex.1966).

And similarly,

"We hold that the particular . . . hospital must be approved by the insurer. There are probably many hospitals that render a type of service similar to those generally approved as a part of the plan of operation that may render inferior service or be guilty of practices not acceptable to the insurer. We do not mean to intimate that this is true of Mercy Hospital. In fact, there is nothing in the evidence indicating such. The policy does not provide the insurer will pay for services rendered by a 'non-member hospital' of the 'type' approved. It provides that any non-member hospital must be approved [by the AMA]. We must take the contract as we find it." *Van Court v. Group Hospital Service, Inc.*, 345 S.W.2d 343, 346 (Tex.Civ.App.—Houston, 1961, no writ).

3.

The policy of insurance made the basis of this suit is not ambiguous. See *Guardian Life Ins. Co. v. Scott, supra.*

4.

■ As a matter of law, The Oaks does not qualify as a Hospital under the instant policy's first alternative definition, since it is not primarily engaged in providing surgical or diagnostic laboratory or x-ray facilities on the premises. *Guardian Life Ins. Co. v. Scott, supra; Mertes v. California-Western States Life Ins. Co.*, 511 S.W.2d 609 (Tex.Civ.App.—Waco, 1974, no writ); *Aetna Life Ins. Co. v. Adams, supra.*

5.

■ The Court further concludes as a matter of law, that accreditation by JCAH as a Children's and Adolescents' Psychiatric Facility did not constitute accreditation by the JCAH as a Hospital. In order for The Oaks to be considered a "Hospital" within the meaning of the insurance contract made the basis of this suit, it must be accredited *as a Hospital* by JCAH. The Court must take the insurance contract as it is written. *Van Court v. Group Hospital Service, Inc., supra*; see also *Herring v. American Bankers Ins. Co.*, 216 So.2d 137 (La.App.1968, writ ref'd). It follows that the Court must take the JCAH's accreditation as it is pronounced by the JCAH: namely, Children's and Adolescents' Psychiatric Facility, and none other.

6.

The Court's ultimate conclusion of law is that The Oaks was not a "Hospital" within the meaning of the insurance contract made the basis of this suit at any time during John Barton Halbert's stay there between March 7, 1973, and May 30, 1975.

7.

Accordingly, Defendant, The Prudential Insurance Company of America, is entitled to judgment that the Plaintiff take nothing by this suit, and the Defendant is entitled to recover its costs.

Any finding of fact heretofore made which constitutes a conclusion of law is hereby adopted as a conclusion of law and any conclusion of law which is a finding of fact is hereby adopted as a finding of fact.

Judgment will be entered in accordance with the findings.